*11 Opinion- on Demurrer
ADKINS, J.
Plaintiff brings this suit against Andrew W. Mellon, formerly Secretary of the Treasury, and Ogden L. Mills, formerly Undersecretary and at times Acting Secretary of the Treasury, to recover damages in the sum of $250,000 alleged to have been caused by acts committed by defendants in their official positions. R. M. Estes, Deputy Commissioner of Internal Revenue, was sued originally but plaintiff has dismissed as to him.
In 1928 plaintiff began the manufacture of a cooking compound composed principally of cocoanut oil and peanut oil and of small amounts of flavoring and coloring matter.
The declaration as modified by original and amended bills of particulars charges in substance that in April, 1929, the Commissioner of Internal Revenue without color of law erroneously held that plaintiff’s product was taxable at 10 cents a pound under the oleomargarine act; that the Commissioner levied an assessment of $5,000 for such taxes against plaintiff on its product sold in January, 1929, and that the Commissioner and his subordinates demanded payment thereof from plaintiff, and notified all dealers handling its product that they must pay the annual tax imposed by law on dealers in oleomargarine, and that assessments were made against some of said dealers; that these demands were repeated until enjoined by the courts in equity suits hereafter described; that this conduct inflicted great loss upon plaintiff and virtually destroyed its business before July, 1931, at which time an amended act of Congress admittedly made its product subject to the 10 cent tax.
Plaintiff charges that the conduct of the Commissioner and his subordinates was approved by defendants and that the acts of all of them “were without color of law, arbitrary, illegal, wanton, capricious, oppressive, malicious and contemptuous.”
Each defendant demurs on a number of grounds. The *12 principal proposition is that each defendant was engaged in the performance of an official duty requiring the exercise of judgment and discretion and that he is privileged from suit because of any act done by him in the performance of that duty.
The oleomargarine act of August 2, 1886 (24 Stat. 209), imposed a tax of 2 cents a pound on colored oleomargarine made in imitation or semblance of butter or calculated or intended to be sold as butter or for butter. The tax was increased, to 10 cents a pound by act of May 9, 1902 (32 Stat. 193). This tax is to be represented by coupon stamps (USCA Title 26, section 546).
Section 14, after creating in the office of the Commissioner of Internal Revenue an analytical chemist and microscopist, continued:
“And such Commissioner is authorized to decide what substances, extracts, mixtures, or compounds which may be submitted for his inspection in contested cases are to be taxed under this Act; and his decision in matters of taxation under this Act shall be final.”
Sec. 20 provided that the Commissioner, with the approval of the Secretary of the Treasury, “may make all needful regulations for the carrying into effect of this Act.”
Sec. 2 of the act provides that the following shall be known as oleomargarine:
“All substances heretofore known as oleomargarine, oleo, oleomargarine oil, butterine, lardine, suine, and neutral; all mixtures and compounds of oleomargarine, oleo, oleomargarine oil, butterine, lardine, suine, and neutral; all lard extracts and tallow extracts; and all mixtures and compounds of tallow, beef fat, suet, lard, lard-oil, vegetable-oil annotto', and other coloring matter, intestinal fat, and offal fat made in imitation or semblance of butter, or when so made, calculated or intended to be sold as butter or for butter.”
Under this definition it was necessary for the Commissioner to determine, first, whether the statute applied to com *13 pounds composed entirely of vegetable-oils; and, second, if so, whether plaintiff’s product was made in imitation or semblance of butter, or was calculated or intended to be sold as and for butter.
In the description in Sec. 2 of the mixtures and compounds all of the language applies to animal fats except the expression “vegetable-oil annotto.” Annotto is a coloring matter. If the phrase quoted applies only to annotto, vegetable-oil compounds are not taxable within the statute. The answer depended upon whether a comma should be inserted between “vegetable-oil” and “annotto.”
In Miller v. Standard Nut Margarine Company of Florida, 284 U.S. 498 (plaintiff herein), decided in 1932, the Supreme Court held that the statute was to be read as it appeared in the engrossed act, in which a comma did not appear in the phrase quoted; that therefore the term vegetable-oil applied only to annotto, and that vegetable-oil products were not taxable as oleomargarine.
Certain sections of Title 26 USCA, Internal Revenue, are important to the decision of this case.
Sec. 1 creates the office of Commissioner of Internal Revenue who is to be appointed by the President, with the advice and consent of the Senate.
Sec. 2 provides:
“The Commissioner of Internal Revenue under the direction of the Secretary of the Treasury shall have general superintendence of the assessment and collection of all duties and taxes imposed by any law providing internal revenue.”
Sec. 3 provides for the employment in the Bureau of Internal Revenue of five deputy commissioners; to each of whom the Commissioner may assign such duties as he may prescribe (Sec. 4).
Sec. 12 provides that the President may establish convenient collection districts; Sec. 14 provides for the appoint *14 ment by the President, with the advice and consent of the Senate, of a collector for each district.
Every collector shall from time to time cause his deputies to proceed through every part of his district and inquire after and concerning all persons who are liable to pay any internal revenue tax and to make a list of such persons (Sec. 91).
Sec. 102 provides that the Commissioner shall make the inquiries, determinations and assessments of all taxes and penalties imposed where such taxes have not been duly paid by stamp- at the time and in the manner provided by law—
“and shall certify a list of such assessments when made to the proper collectors respectively who shall proceed to collect and account for the taxes and penalties so certified.”
It shall be the duty of the collectors in their respective districts to collect all the taxes imposed by law however the same may be designated (Sec. 103).
The collector shall after receiving any list of taxes from the Commissioner give notice to each person liable to pay any tax stated therein. If the tax is not paid within ten days thereafter, it shall be the collector’s duty to collect the taxes with penalty and interest (Sec. 104).
Sec. 207 imposes an annual tax of $480 upon wholesale dealers and $48 upon retail dealers in oleomargarine.
Sec. 546 imposes a tax of 10 cents per pound upon colored oleomargarine, the tax to be represented by coupon stamps.
Sec. 547 provides that whenever a manufacturer sells his product without the use of proper stamps it shall be the duty of the Commissioner, upon satisfactory proof, to- estimate the amount of tax which has been omitted to be paid and make an assessment therefor and certify the same to the collector (see also Sec. 1176).
Sec. 154, formerly Sec. 3224 HSUS, provides:
“No suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court.”
*15 The question settled by the Supreme Court in 284 U. S. as to the construction of the oleomargarine act first arose in 1924 in Higgins Mfg. Co. v. Page, 297 F. 644.
From the legislative history of the act there was some reason for the view that Congress intended the comma to be inserted between the expression “vegetable-oil” and “annotto.” The comma did not appear in the engrossed statute, or in the statutes at large. But in every publication of the Internal Revenue laws issued after the passage of the oleomargarine act and in several Supreme Court opinions quoting the section the comma was inserted. See McCray v. U. S., 195 U. S. 27; Cliff v. U. S., 195 U. S. 159; Moxley v. Hertz, 216 U. S. 344.
The Higgins case was the first of 14 suits involving the question of the construction of the statute, and whether various vegetable-oil compounds were taxable as oleomargarine. Three suits were filed by Higgins, and a fourth by a licensee of Higgins. Four suits were filed by Standard Nut Margarine Company, plaintiff herein, and in a fifth suit it and eight other makers of similar compounds were plaintiffs. Four suits were filed by other manufacturers. One suit was filed by the United States against plaintiff herein to collect the taxes on its product, but this case was never tried.
Two suits were filed in Rhode Island; seven were filed in this court; two were filed in the United States District Court for Florida; of the others one was filed in the United States District Courts for Missouri, Georgia, and South Carolina, respectively. These resulted in two decisions in Circuit Courts of Appeals, and one in the Supreme Court of the United States.
At the insistence of plaintiff I am judicially noticing the records of the seven suits filed in this court, and I take some facts from those records.
In 1922 Higgins originated a vegetable-oil product to be sold as a cooking compound, and later called Nut-Z-Oil. He sent his formula to the Commissioner of Internal Revenue. The latter advised that, if the product was not sold in such *16 a way as to mislead the consumer into the belief he was receiving a butter substitute, the product would not be taxable as oleomargarine. Higgins began its manufacture. Thereafter the Commissioner concluded that the product was being sold as and for butter. In December, 1922, he advised Higgins that the product was taxable and levied the tax. Higgins paid a tax of $16.50 and sued to recover it back.
Brown, D. J., held as matter of law that the statute should be read as though it contained a comma between the expressions “vegetable-oil” and “annotto,” and that therefore it included vegetable-oil compounds. He found as matter of fact that the product was not being sold as and for butter, and gave judgment for plaintiff (297 F. 644). No appeal was taken,
Judge Brown’s opinion was issued by the Treasury Department as Treasury Decision 3590, dated May 21, 1924, signed by Commissioner Blair and approved by Secretary Mellon.
August 20, 1924, Deputy Commissioner of Internal Revenue Estes, in reply to letters of the Institute of Margarine Manufacturers calling attention to the advertisement and sale by retailers of Nut-Z-Oil as butter, replied that the product was held taxable by the office, stated the decision above mentioned, and continued:
“The court having held the product to be not taxable as oleomargarine, the fact that retailers advertise and sell it as butter, or as a substitute for butter would not render them or the manufacturers liable under the internal revenue law.”
Thereafter other manufacturers went into the business, in each instance submitting a sample of their product to the Commissioner, apparently under Section 14 of the oleomargarine act above quoted.
November 5, 1924, Estes, Deputy Commissioner, wrote the Baltimore Butterine Co. that its product Nu-ine would not be taxable as oleomargarine provided it was not marketed in such a way as to mislead the consumer into the belief that *17 the product is a butter substitute (Ex. 6, Bill of Particulars— unless otherwise stated I refer to exhibits attached to the Mellon bill of particulars).
August 19, 1926, a similar letter was written to Ed. S. Vail Butterine Company of Chicago (Ex. 7).
January 29, 1927, the Ideal Food Products Company of Peoria was advised that its product, Sunbeam, would not be held subject to tax so long as the present regulations stay in force; but that under a proposed modification of the regulations, which probably would be approved in the near future, the product would be taxable as oleomargarine (Ex. 8).
The new regulations were issued April 1, 1927, to be effective October 1, 1927, by T. D. 4006 signed by Commissioner Blair and approved by Acting Secretary Mills.
The effect of the change was to amend Reg. 9 dealing with cooking compounds so as to provide that if such cooking compounds were colored to look like butter that fact alone would make them taxable as oleomargarine.
Two suits resulted. The first was filed by the Higgins Company in Rhode Island. Lowell, D. J., granted a temporary injunction July 18, 1927. On the pleadings he found that no change had occurred in plaintiff’s product, and that the collector’s threatened action was in defiance of the court’s prior decision. The injunction was to remain in force only so long as the product was made from the same materials and marketed in the same manner as found by Judge Brown. Higgins Mfg. Co. v. Page, 20 F (2d) 948. This injunction. was made permanent December 29, 1927.
The other suit was filed June 20, 1927, in this court by Baltimore Butterine Co. against Mellon as Secretary of the Treasury, Estes, Deputy Commissioner, and against the Commissioner of Internal Revenue, Equity 47120. Plaintiff alleged that its product Nu-ine was identical with the Higgins product, that it began manufacture in 1924 in reliance on the letter before set forth, and had built up a substantial business.
*18 Justice Bailey of this court enjoined the enforcement of the regulation. He was of opinion that the regulation could not enlarge the statute; that if plaintiff’s product was identical with the Higgins product Judge Brown’s decision was controlling. He said: “There would be no end to litigation if
the defendant should persist in levying a tax after the Courts have held that tax invalid” (see 49 F (2d) 81).
This injunction was made permanent by Justice Hoehling on final hearing December 16, 1927.
As a result of these suits the effective date of T. D. 4006 was twice postponed and it was finally revoked. The first postponement was by T. D. 4084 signed by Commissioner Blair and Acting Secretary Mills. The second postponement was by T. D. 4114 signed by Commissioner Blair and approved by Secretary Mellon. The revocation was by T. D. 4119 signed by Commissioner Blair and approved by Secretary Mellon.
Plaintiff herein, an oleomargarine manufacturer, began making its vegetable-oil product in 1928 and built up a substantial business therein. Before beginning such manufacture its representative visited the collector of Internal Revenue at Jacksonville, complained of the unfair competition from several concerns which were selling yellow cooking compounds and representing them as being as good as butter or oleomargarine, stated a desire to go into that business, and made a number of inquiries, which the collector forwarded to Washington.
March 29, 1928, Estes wrote the collector (Ex. 1):
“The products known as ‘Nu-ine,’ ‘Higgins Nut Product,’ ‘Penobscot,’ and other similar compounds are probably the ones referred to by the representative of the Standard Nut Margarine Company.
“While this office considers that such compounds are properly taxable as oleomargarine under- the law, in view of certain adverse court decisions no* attempt is being made to hold them taxable at the present time. Accordingly the Standard Nut Margarine Company has the same privilege of making a com *19 pound of the kind in question without taxing same as oleomargarine as is being enjoyed by those manufacturers who obtained favorable decisions from the courts. There is nothing in the law or regulations to prevent a manufacturer of oleomargarine from using his machinery and equipment to manufacture such a product.”
Some time prior to February, 1929, a field investigation was made by agents of the Bureau of Internal Revenue of the vegetable-oil products and of the manner of their marketing. Samples of the products of plaintiff and the other manufacturers were obtained, and were analyzed by the chemist of the Bureau (in accordance with Sec. 14 of the oleomargarine act). As a result of this investigation and upon all the reports before him David H. Blair, Commissioner of Internal Revenue, reached the conclusion that each of the products above mentioned, including that of plaintiff, was made in semblance of butter, and that it was actually intended and calculated by the manufacturers to be sold as butter and was sold as and for butter (Commissioner’s Annual Report for 1929; answer of defendants in Ed. S. Vail Butterine Co. et. al. v. Blair, Equity 49751, in this court, pp. 11-14).
Having 'reached this conclusion, it was Commissioner Blair’s duty under the law to estimate the amount of the stamp tax which had not been paid and to make assessments therefor, and this the Commissioner did.
The assessment against plaintiff was made April 24, 1929, for $5,000 for product made in January, 1929.
As required by law the Commissioner forwarded the assessments to the proper collectors and gave written instructions to make the collections.
Under the law it was the duty of the collectors to collect the taxes so assessed as well as the annual taxes from dealers handling plaintiff’s products.
To enjoin such collections three suits were filed in this court, in one or another of which all the manufacturers ex *20 cept the Higgins Co. were plaintiffs. That company and its licensees later filed separate suits.
On February 27, 1929, the Harrow-Taylor Butter Company of Kansas City, Missouri, filed in this court Equity No. 49479 against Mr. Mellon as Secretary of the Treasury, Commissioner of Internal Revenue Blair, Deputy Commissioner Estes, and Noah Crooks, collector for the 6th District of Missouri.
The bill, after stating the prior litigation, alleged that plaintiff had submitted a sample of its vegetable-oil product to the Commissioner whose deputy, Estes, replied by letter similar to the letters to other manufacturers; that plaintiff began to manufacture its product, Rich Nut Compound, and had built up a business therein; that in 1929 the collector of internal revenue sent agents to examine its books; that on February 13, 1929, the Commissioner , made an assessment of $500 against plaintiff for the stamp tax on its product sold in January, and that Collector Crooks notified plaintiff of the assessment and requested its payment. The bill prayed that defendants be enjoined from attempting to collect said tax.
The answer was signed and sworn to by Messrs. Mellon, Blair and Estes. It averred that plaintiff’s product was made in imitation and semblance of butter and being so is calculated and intended to be sold as butter or for butter (par. 4); that the product which plaintiff is now manufacturing is not the same product submitted by plaintiff to the Commissioner of Internal Revenue, and that its present product is taxable under the oleomargarine law (par. 20).
On April 20, 1929, Justice Bailey overruled the motion for injunction pendente lite because “the defendants deny that the product sold is the same as that passed upon by them and apparently there has been no adjudication by the court that the plaintiff’s product is not taxable.”
On April 30,1929, the Ed. S. Vail Butterine Co., Standard Nut Margarine Co., and seven other manufacturers of vege *21 table-oil products filed a suit in this court against Commissioner Blair and Deputy Commissioner Estes, Equity No. 49751.
The bill set forth the prior litigation, averred that each plaintiff before beginning business had submitted a sample of its product to the Commissioner and received the letters before set forth or letters similar thereto; that said letters were written after an analysis of plaintiff’s products and constituted final decisions that said products were not taxable as oleomargarine.
The bill also averred that in April, 1929, various internal revenue officers acting under instructions of defendant Estes called on plaintiffs at their places of business and demanded payment of various taxes upon the nut products theretofore made by them.
The bill sought to enjoin collection of said taxes and of annual taxes from dealers handling plaintiff’s products.
The sworn answer signed by both defendants Blair and Estes contains a full statement of what they believed to be the facts.
The answer avers that the products then being sold by plaintiffs differed from the original Higgins product and were marketed in a different manner; that the products then being made by the plaintiffs were not the same as the samples originally submitted by them to the Bureau of Internal Revenue, and were not being placed upon the market and sold for the same purposes as the samples originally submitted to the Bureau and analysed by it;
That samples of the products then being manufactured and marketed by plaintiffs had been secured from agents and dealers of plaintiffs throughout the United States and had been analysed by chemists of the Bureau; that said samples show that plaintiffs’ products were different from their original samples and of a much smoother and finer texture and quality, and were similar to butter;
*22 The answer alleged that all of said products were made in imitation and semblance of butter, were calculated and intended to be sold and are sold as and for butter; that said products were advertised in many states as a substitute for butter and sold in imitation of butter; that said products were purchased in the public market as imitations of butter and were used by the public as imitation butter; that plaintiffs well knew their products were being marketed by their agents and dealers as and for butter and that the products were being sold in imitation and semblance of butter;
That all of said products were included in and intended to be included in the definition of oleomargarine given in the statute and that the products upon which a tax has been assessed and for which payment has been demanded are products which are manufactured and marketed and come within the provisions of the oleomargarine act as amended.
On May 6, 1929, a similar suit was filed by the Baltimore Butterine Co., against the same defendants, Equity No. 49778. The answer is in substance the same.
In both suits a motion for temporary injunction was denied by Justice Bailey on May 20, 1929, and temporary restraining orders theretofore signed were vacated. The suits were dismissed by plaintiff on July 11, 1930.
From a memorandum signed by Commissioner of Internal Revenue Lucas, who on June 1, 1929, had succeeded Commissioner Blair, it appears that on June 12, 1929, a conference was held in his office with various representatives of the Bureau, and it was decided that the compounds here involved should be held subject to tax at least from April 1, 1929; and that an arrangement had been made with counsel representing some of the manufacturers for the Harrow-Taylor Company to bring a test suit at Kansas City, Missouri, against the collector of internal revenue to recover a tax to be paid on its product; and that pending decision of that case no attempt would be made to collect any tax then assessed against any *23 manufacturer or dealer in the products involved (Ex. 4 Amended Bill).
On June 22, 1929, the collectors were advised in accordance with the foregoing memorandum (Ex. 13).
On June 25, 1929, the Harrow-Taylor Butter Co. sued Noah Crooks, Collector of Internal Revenue, to recover the tax paid on its compound. The case was tried in the Western District of Missouri before Judge Reeves, without a jury. On August 5, 1929, Judge Reeves delivered his opinion in which he agreed with the construction of the oleomargarine law adopted by Judge Brown.
Judge Reeves held that the evidence showed that plaintiff’s product looked and tasted like butter, and was marketed, in cartons similar in size and shape, as butter; that plaintiff’s dealers kept its product with butter and recognized oleomargarine substances and proffered same to the customers as a suitable substitute for butter; that restaurant keepers regularly served the product as butter and for butter; and that it would be idle to say that plaintiff did not know that its customers and retail dealers were selling the substance as a butter substitute. The court found that plaintiff’s product was not only made in imitation or semblance of butter but was calculated and intended to be sold as butter and for butter.
This case was affrmed on appeal on May 20, 1930, in 41 F(2d) 627. The court was composed of Circuit Judges Booth and Gardner and District Judge Sanborn. The court expressly held that the statute included the vegetable-oil compounds.
On August 24, 1929, Commissioner Lucas notified the collectqrs of the favorable decision by the District Court in the Harrow-Taylor ease, and that it was the purpose of the Bureau to place manufacturers of artificially colored cooking compounds on the same footing as other manufacturers of oleomargarine, and that the collectors would be notified of the *24 conclusions to be formulated at a general conference of the cooking compound industry to be held in the Commissioner’s office in the near future; that as to future sales by dealers the immediate enforcement of collection of taxes on dealers would be effective October 1, 1929, and the collectors were requested to give publicity to that fact (Ex. 13).
Apparently most manufacturers regarded the decision of Judge Reeves as conclusive.
But plaintiff herein, Standard Nut Margarine Co., and the Higgins Company brought other suits in which they enjoined the collection by the officials of the Bureau of the tax as against them or dealers in their products.
The Standard Nut Margarine Company brought four suits. The first was filed in the United States District Court for Florida against Miller, Collector of Internal Revenue for Florida, in which plaintiff’s factory was located.
January 7, 1930, Judge Lake Jones enjoined the collector pendente lite, and at the trial in March, 1930, made this injunction final.
The case was affirmed by the Circuit Court of Appeals April 22, 1931, 49 F(2d) 79, and by the Supreme Court February 15, 1932, 284 U. S. 498.
The second suit was in the United States District Court for Georgia against Rose, collector, to restrain the collection from plaintiff or any dealer selling plaintiff’s product of any tax under the oleomargarine act.
On June 2, 1930, District Judge Sibley refused the injunction on the ground that the suit was one to restrain the collection of a tax and could not be maintained under 26 USCA Sec. 154 (formerly Sec. 3224 RSUS). This was reversed by the Circuit Court of Appeals, and the decision of that court was affrmed by the Supreme Court.
A similar suit was filed in South Carolina against Jones, collector. A temporary restraining order was granted October *25 10, 1930, but upon hearing a temporary injunction was denied for the reason given by Judge Sibley.
While appeals were pending in the Florida and Georgia cases, plaintiff on December 2, 1930, filed suit in this court against David Burnet,. Commissioner of Internal Revenue, Equity No. 52174, to restrain him from assessing and collecting a tax on plaintiff’s product. A temporary injunction was granted by me on terms which would protect plaintiff from interference until the decision on the appeal in the Florida case.
On April 22, 1931, that case was affirmed in 49 F(2d) 79. The court stated that the grounds principally relied on to reverse the case were that the decision of the Commissioner that plaintiff’s product was taxable was made final by Sec. 14 of the oleomargarine act (now Sec. 582, Title 26 U. S. Code); that the maintenance of the suit was forbidden by Sec. 3224 R. S., now Sec. 154 Title 26; and that the United States was an indispensable party to the suit.
As to the first question the court held that the Commissioner’s decision was based on an ex parte investigation and that the evidence on which his action was based was so unsubstantial as to be frivolous; that it was taken in contemptuous disregard of unappealed from court decisions and amounted to an administrative attempt to coerce the payment of money the exaction of which the official who took that action thought ought to be authorized by law but which he did not really believe was authorized by the then existing statute as uniformly construed by the courts. The court continued:—
“The basis of the claim that plaintiff’s product was taxable as colored oleomargarine was so unsubstantial as to be frivolous, and the holding that it was so taxable was so arbitrary and capricious that it amounted to a mere administrative fiat which in effect was no decision at all” (84).
As to the second question the court held that the facts *26 were so extraordinary that Sec. 3224 was inapplicable and the injunction would not be prevented thereby.
Finally the court held:—
“The United States is not a necessary party to this suit, the object of which is to restrain threatened illegal conduct of a Federal official violative of the rights of the plaintiff” (85).
The court placed some reliance upon the fact it had affirmed a decision of the District Court of Georgia holding that the product of the Baltimore Butterine Company is not an imitation of butter. Baltimore Butterine Co. v. Talmadge, 32 F(2d) 904; affirmed 37 F(2d) 1014.
On writ of certiorari the Supreme Court, in Miller v. Standard Nut Margarine Co., 284 U. S. 498, affirmed the decision of the Court of Appeals.
In the opinion, Mr. Justice Butler, after giving a history of the litigation, concluded that Sec. 2 of the oleomargarine act was to be construed as it appeared in the engrossed statute, that is, without the comma; and that therefore the statute did not impose a tax upon products made entirely from vegetable substances. It necessarily followed that plaintiff’s product was not taxable under the oleomargarine statute.
In the Supreme Court the collector sought reversal on the ground that the statute forbids an injunction against the collection of taxes; and that the assessment was made by the Commissioner under color of his office and was not arbitrary and capricious, and that the case did not come within any exception to the application of Sec. 3224.
The Supreme Court denied both contentions, saying:—
“His determination that respondent’s product was oleomargarine and taxable under the Act was erroneous and, in view of his earlier interpretations and the court decisions which had become final, must be held arbitrary and capricious. It was without force” (508).
Again—
“This is not a case in which the injunction is sought upon *27 the mere ground of illegality because of error in the amount of the tax. The article is not covered by the Act. A valid oleomargarine tax could by no legal possibility have been assessed against respondent, and therefore the reasons underlying Section 3224 apply, if at all, with little force. ... It requires no elaboration of the facts found to show that the enforcement of the Act against respondent would be arbitrary and oppressive, would destroy its business, ruin it financially and inflict loss for which it would have no remedy at law. It is clear that, by reason of the special and extraordinary facts and circumstances, Section 3224'does not apply. The lower courts rightly held respondent entitled to the injunction” (510, 511).
The opinion of the Circuit Court of Appeals discusses the legislative history of the act of July 10, 1930 (46 Stat. 1022), beyond doubt imposing the tax on plaintiff’s product. The court quoted two letters from Commissioner Lucas urging passage of the proposed amendment. In one, dated January 10, 1930, he stated that the Bureau “is of opinion that they are unquestionably made in imitation or semblance of butter and should be subject to the tax imposed under the oleomargarine law” (p. 82, 83). The court thought this showed that the assessment was made by an official who really did not believe that his action was authorized by the existing statute (p. 84).
The assessment against plaintiff was made by Commissioner Blair, the predecessor of Commissioner Lucas. The answer of Commissioner Blair in Ed. S. Vail Butterine Co. v. Blair, above stated, shows that Commissioner Blair made his decision after careful consideration both of the prior decisions and of the facts and that he believed that the products of plaintiff and the other manufacturers were taxable as oleomargarine.
In this case I think we are concerned with the decision of.Commissioner Blair assessing the tax; so long as that assessment stood it was the duty of the collectors to carry it out.
Various official letters written by Commissioner Lucas *28 after the final decree in the Florida case, not in evidence in that case, and made part of the bills of particulars indicate to my mind that Mr. Lucas did believe that plaintiff’s product was taxable under the oleomargarine act.
On September 18, 1930, the Higgins Manufacturing Company brought suit No. 51890 in this court to restrain the Commissioner of Internal Revenue and Estes from attempting to collect the tax against its product. Upon the trial before me I found as a fact that the product did not differ in any substantial manner from the product sold in 1924, and that it was being marketed in the same manner as it was found to be marketed by plaintiff in the suit brought before Judge Brown (Findings 8 and 11). Therefore I granted the injunction.
The Danish Packing Company, a licensee of the Higgins Company, on May 7, 1930, filed Equity Suit No. 51371 in this court against Messrs. Mellon and Estes and the Commissioner of Internal Revenue. The answer, signed and sworn to by all defendants, was filed May 24, 1930. On June 30, 1930, Justice Hitz denied plaintiff’s motion for preliminary injunction. The case was dismissed by plaintiff on April 1, 1932.
It thus appears that from the passage of the oleomargarine act in 1886 until 1924 it was assumed by all concerned that the act applied to vegetable-oil products as well as to animal fats; that in 1924, in the Higgins case, for the first time the question was squarely presented in court, and the court decided as matter of law that the statute did include vegetable-oil products, and as matter of fact that the Higgins product was not manufactured in semblance of butter and was not calculated or intended to be and was not sold as and for butter; that in 1929 Mr. Blair, Commissioner of Internal Revenue, as the result of an elaborate field investigation, reached the conclusion as matter of fact that the vegetable-oil products then were being made in semblance of butter *29 and were calculated and intended by the manufacturers to be and were sold as and for butter and were taxable as oleomargarine; that this court in suits filed by plaintiff and other manufacturers of such products refused to enjoin collection of assessments made by Commissioner Blair against the manufacturers as the result of his decision; that in a test suit filed by the Harrow-Taylor Company in the United States District Court for Missouri Judge Reeves, D. J., on the facts held that Commissioner Blair was correct and sustained the assessment, and this decision was affirmed by the Circuit Court of Appeals; that pending the appeal in that case plaintiff filed a suit against the collector of internal revenue of Florida in the United States District Court for that state, and Judge Jones reached a contrary conclusion and agreed with the plaintiff that its product was not taxable; that this decision was affirmed by the Circuit Court of Appeals and by the Supreme Court of the United States, the latter holding that the statute did not include vegetable-oil products and therefore that plaintiff’s product could not be taxed as oleomargarine.
OPINION
The question in this case is whether defendants are liable to plaintiff for losses alleged to have been suffered by it by reason of the assessment against plaintiff of a tax on its product and the attempt to collect that tax and to collect annual license taxes from dealers handling its product.
The demurrers raise a number of other points. One is that the bills of particulars have so modified the declaration as to show that the acts complained of by plaintiff were done by the Commissioner of Internal Revenue and his deputies and not by either of the defendants. The bills of particulars do substantially modify the allegations of the declaration with respect to the acts said to have been done by each defendant. On this point I think the law is settled in the case *30 of Robertson v. Sichel, 127 U. S. 507. However I do not think it necessary for me to attempt to apply that case to the final allegations here because I am deciding the demurrer on the question of privilege.
On the latter point defendants contended that a public officer is privileged from suit for damages by an individual injured by acts done by the officer in the performance of his official duties requiring the exercise of judgment and discretion. Plaintiff admits the general principle but contends that it is not applicable if the officer has acted maliciously, arbitrarily or capriciously or has exceeded his jurisdiction.
After careful study of the very able briefs filed on both sides I am convinced that defendants are privileged from suit by plaintiff under the facts of this case.
(a) It is uniformly held that the privilege is applicable to the judicial acts of courts.
Bradley v. Fisher, 13 Wall. 335, is a leading case. Bradley was a member of the bar of this court. Justice Fisher, who presided at the trial of U. S. v. John H. Suratt in the Criminal Court of the District of Columbia, entered an order striking Bradley’s name from the roll of attorneys in that court, for an act done during the progress of that trial. Bradley brought suit for damages.
One plea stated that the order of disbarment was a judicial act done by defendant as presiding justice of a court of general criminal jurisdiction. The Supreme Court said:
“If such were the character of the act, and the jurisdiction of the court, the defendant cannot be subjected to responsibility for it in a civil action......it is a general principle of the highest importance to the proper administration of justice that a judicial officer, in exercising the authority vested in him, shall be free to act upon his own convictions, without apprehension of personal consequences to himself. Liability to answer to every one who might feel himself aggrieved by the action, of the judge, would be inconsistent with *31 the possession of this freedom, and would destroy that independence without which no judiciary can be either respectable or useful. As observed by a distinguished English judge, it would establish the weakness of judicial authority in a degrading responsibility” (347).
After stating that this principle obtains in all countries where there is any well-ordered system of jurisprudence and has been the settled doctrine of the English courts for many years and has, as Chancellor Kent observes, “a deep root in the common law,” the Court continued:
“Nor can this exemption of the judges from civil liability be affected by the motives with which their judicial acts are performed. The purity of their motives cannot in this way be the subject of judicial inquiry. This was adjudged in the ease of Floyd and Barker, reported by Coke, in 1608, where it was laid down that the judges of the realm could not be drawn in question for any supposed corruption impeaching the verity of their records, except before the king himself, and it was observed that if they were required to answer otherwise, it would 'tend to the scandal and subversion of all justice, and those who are the most sincere, would not be free from continual calumniations.’
“The truth of this latter observation is manifest to all persons having much experience with judicial proceedings in the superior courts. Controversies involving not merely great pecuniary interests, but the liberty and character of the parties, and consequently exciting the deepest feelings are being constantly determined in those courts, in which there is great conflict in the evidence and great doubt as to the law which should govern their decision. It is this class of cases which impose upon the judge the severest labor, and often create in his mind a painful sense of responsibility. Yet it is precisely in this class of cases that the losing party feels most keenly the decision against him, and most readily accepts anything but the soundness of the decision in explanation of the action of the judge. ... If civil actions could be maintained in such cases against the judge, because the losing party should see fit to allege in his complaint that the acts of the judge were done with partiality, or maliciously, or corruptly, the protec *32 tion essential to judicial independence would be entirely swept away. New persons sufficiently irritated to institute an action against a judge for his judicial acts would hesitate to ascribe any character to the acts which would be essential to the maintenance of the action” (347-348).
In Anderson v. Gorrie, 1 Q. B. D. (1895) 668, the Court of Appeal applied the principle to the conduct of the judges of the Supreme Court of a colony who had committed the plaintiff for contempt of court and held him to excessive bail. Lord Esher, M. R., quoted Crompton, J. in Fray v. Blackburn, 3 B. & S. 578, as follows:
“It is a principle of our law that no action will lie against a judge of one of the superior courts for a judicial act, though it be alleged to have been done maliciously and corruptly. . . . The public are deeply interested in this rule, which indeed exists for their benefit, and was established in order to secure the independence of the judges, and prevent their being harassed by vexatious actions.”
In Scott v. Stansfield, L. R. 3 Exch. 220, the principle was applied to a statement made by the trial judge with respect to one of the parties to a case on trial before him.
Many cases are collected in Bohlen on Torts (3d ed.) 885.
The question has arisen whether the immunity extends to cases in which the judge’s decision is not within his jurisdiction.
In Bradley v. Fisher the court held that:
“. . . judges of courts of superior or general jurisdiction are not liable to civil actions for their judicial acts, even when such acts are in excess of their jurisdiction, and are alleged to have been done maliciously or corruptly” (351).
The court discussed the difference between excess of jurisdiction and clear absence of all jurisdiction over the subject-matter, and said:
“. . . where jurisdiction over the subject-matter is invested by law in the judge, or in the court which he holds, the *33 manner and extent in which the jurisdiction shall be exercised are generally as much questions for his determination as any other questions involved in the case, although upon the correctness of his determination in these particulars the validity of his judgment may depend. Thus, if a probate court, invested only with authority over wills and the settlement of estates of deceased persons, should proceed to try parties for public offences, jurisdiction over the subject of offences being entirely wanting in the court, and this being necessarily known to its judge, his commission would afford no protection to him in the exercise of the usurped authority. .But if on the other hand a judge of a criminal court, invested with general criminal jurisdiction over offences committed within a certain district, should hold a particular act to be a public offence, which is not by the law made an offence, and proceed to the arrest and tried of a party charged with such act, or should sentence a party convicted to a greater punishment than that authorized by the law upon its proper construction, no personal liability to civil action for such acts would attach to the judge, although those acts would be in excess of his jurisdiction, or of the jurisdiction of the court held by him, for these are particulars for his judicial consideration, whenever his general jurisdiction over the subject-matter is invoked” (352).
The question has also, arisen whether the immunity applies to inferior courts.
In Bohri v. Barnett, 144 Fed. 389, the Circuit Court of Appeals for the Seventh Circuit held that the privilege was applicable to a justice of the peace.
After quoting from Bradley v. Fisher on the question of excess of jurisdiction, the court said:
“To the same effect is Brooks v. Mangan, 86 Mich. 576, 49 N. W. 633, 24 Am. St. Rep. 137, and Robertson v. Parker, 99 Wis. 652, 75 N. W. 423, 67 Am. St. Rep. 889. In the Wisconsin case the court quoted Bishop as follows:
“ 'But in reason if judges properly expected to be most learned can plead official exemption for their blundering in the law, a fortiori, those from whom less is to be expected should not be compelled to respond in damages for their mistakes honestly made after due carefulness.’ . . .
*34 “ ‘We are content to join in the increasing procession of states that have adopted and are following the more humane and less stringent test of liability in cases of this kind.’ ”
In Grove v. Van Duyn, 44 N. J. L. 654, in the opinion by Chief Justice Beasley, the privilege was held to be applicable to a justice of the peace.
In Cooke v. Bangs, 31 Fed. 640, Mr. Justice Brewer, sitting in the Circuit Court for the District of Minnesota, held that where a justice of the peace having power to commit for contempt and commits a person for contempt and on such person being liberated on habeas corpus recommitted on a fresh warrant for the same offence the justice of the peace was not amenable to a civil action though his action in making the second commitment was erroneous and though it was alleged that he acted maliciously.
In Yaselli v. Goff, 12 F(2d) 402, Rogers, C. J., discussing the cases on both sides, concludes:
“The rule of immunity ‘applies alike to the highest judges in the land and to the lowest officer who sits as a court and tries petty causes.’ ”
(b) The rule is applicable to acts of members of Congress, of Parliament and of other legislatures.
Usually in this country constitutional provisions protect members of the legislatures. At common law the privilege was applied to members of Parliament for the same reason supporting the privilege with respect to courts.
Kilbourn v. Thompson, 103 U. S. 168, is the leading case in this country.
By virtue of a resolution adopted by the House of Representatives a special committee of five members of the House was appointed to make certain inquiries. The resolution recited that the United States was a creditor of the firm of Jay Cooke & Company, then in bankruptcy; it referred to the existence of a real estate pool in the District of Columbia in which Jay Cooke & Company had a large interest; recited that the trustee of the estate of said firm of Jay Cooke & *35 Company had recently made a settlement of the interest of said estate with the associates of said firm to the disadvantage of the creditors of said estate, including the Government of the United States, and that the courts were powerless by reason of said settlement to afford adequate redress to said creditors.
Kilbourn, a member of the real estate pool, when called before the special committee as a witness, refused to name the members of the pool or to answer other questions, for which he was adjudged guilty of contempt by the House of Representatives and a warrant was issued to Thompson, sergeant-at-arms, for his arrest. Thompson arrested Kilbourn under this warrant and the latter was imprisoned and later discharged on writ of habeas corpus.
Kilbourn thereupon brought suit against the sergeant-at-arms and the members of the committee. The latter pleaded that they took no part in the actual arrest and did nothing in relation thereto except by voting in the House and by other acts in the performance of their duty as members of the House.
The Supreme Court held that the members of the House were absolutely privileged from suit by reason of their conduct. The court quoted at length from Coffin v. Coffin, 4 Mass. 1, in which the Supreme Court of Massachusetts held that a member of the legislature was privileged from suit because of statements made in a conversation between him and members on the floor of the House but while neither of them was addressing that body (p. 203).
Kilbourn v. Thompson was followed in the recent case of Cochran v. Couzens, 59 App. D. C. 374, in which it was held that defendant was privileged from suit for statements made in a speech in the Senate.
(c) The same principle is applicable to the heads of executive departments, the heads of bureaus. and other high executive officers.
In Spalding v. Vilas, 161 U. S. 483, 498, the court said:
“We are of opinion that the same general considerations *36 of public policy and convenience which demand for judges of courts of superior jurisdiction immunity from civil suits for damages arising from acts done by them in the course of the performance of their judicial functions, apply to a large extent to official communications made by heads of Executive Departments when engaged in the discharge of duties imposed upon them by law. The interests of the people require that due protection be accorded to them in respect of their official acts. As in the case of a judicial officer, we recognize a distinction between action taken by the head of a Department in reference to matters which are manifestly or palpably beyond his authority, and action having more or less connection with the general matters committed by law to his control or supervision.”
In Kendall v. Stokes, 3 How. 87, 98, Taney, C. J., said:
“A public officer is not liable to an action if he falls into error in a case where the act to be done is not merely a ministerial one but is one in relation to which it is his duty to exercise judgment and discretion; even though an individual may suffer by his mistake.”
In DeArnaud v. Ainsworth, 24 App. D. C. 167, 5 L. R. A. (N. S.) 163, the principle was applied in a suit brought against the chief of the Record and Pension Office of the War Department because of statements made in an official letter by him to the Secretary of War. Alvey, C. J., said:
“The question of motive, or whether there was a want of good faith on the part of the defendant, in the making of the report, is not a material question in the case. A party is not liable for the motives with which he discharges an official duty; nor is he liable for any mistake of fact he may commit in the course of the exercise of that duty. Public policy affords absolute protection and immunity for what may be said or written by an officer in his official report or communication to a superior, when such report or communication is made in the course and discharge of official duty. Otherwise the perfect freedom which ought to exist in discharge of public duty might be seriously restrained, and often to the detriment of the public service. Of course, when a party steps aside from duty and introduces into his report or communication defamatory matter wholly irrelevant *37 and foreign to the subject of inquiry, a different question is presented. But no such question is presented here; and the action is not attempted to be founded upon libelous matter extraneous to the proper subject of inquiry, but upon the report made by the defendant as an entirety” (177, 178).
In Farr v. Velentine, 38 App. D. C. 413, the rule was applied to a letter from the Commissioner of Indian Affairs to the Secretary of the Interior recommending the dismissal of an employe of the Indian Bureau.
In Mellon v. Brewer, 57 App. D. C. 126, the principle was applied to a letter from the Secretary of the Treasury to the President concerning an investigation in the Treasury Department which the plaintiff had been conducting.
In Brown v. Rudolph, 58 App. W. C. 116, it was held that the Commissioners of the District were not responsible in damages for their actions in instituting proceedings to have plaintiff declared insane.
Yaselli v. Goff, 12 F(2d) 396, is directly in point. In that case Senator Goff had been Commissioner and Chief Counsel of the United States Shipping Board. He was appointed Special Assistant to the Attorney General of the United States and conducted criminal proceedings in the Southern District of New York in the course of which Yaselli was indicted for a criminal offense, tried and acquitted. Yaselli then brought action for malicious prosecution against Goff. He alleged that Senator Goff had secured his appointment as a prosecutor maliciously and that he had wilfully and maliciously procured the indictment against Yaselli. The lower court granted a motion to dismiss the complaint. In the Circuit Court of Appeals, Rogers, C. J., delivered an elaborate opinion in which the law was thoroughly discussed. The court held that Mr. Goff was immune from civil action and that this immunity was not destroyed by the allegation that he had acted maliciously.
Plaintiff’s counsel cited a number of cases to the effect that assessors of taxable property are personally liable for damages to a person who is compelled to pay taxes on exempt *38 property assessed by them. Among the cases is Lapolt v. Maltby, 31 N.Y.S., 686.
There seems to be a difference of opinion — especially in the courts of New York — on this subject.
I think the better rule is that an assessor of taxes in making the assessment is acting in a judicial capacity.
In Barhyte v. Shepherd, 35 N.Y. 238, the Court of Appeals holds that the office of assessor in determining what property is subject to and what is exempt from taxation is judicial, and the assessor in determining that question acts judicially, and is not liable for errors committed in arriving at his conclusion.
The following cases hold that assessors of internal revenue of the United States act in a judicial nature in making assessments—
Delaware R. R. v. Prettyman, Fed. Cas. No. 3767.
United States v. Black, Fed. Cas. No. 14600.
United States v. Hodson, Fed. Cas. No. 15376.
Many acts of the Commissioner of Internal Revenue require the exercise of judgment and discretion. From certain of his decisions an appeal lies to the Board of Tax Appeals, and from that Board to the Circuit Courts of Appeals of the United States.
(d) But a public officer is not privileged from suit for damages because of the unlawful imprisonment by him of another or the wrongful taking of property of another.
Plaintiff’s counsel contend that the pleadings show that the defendants acted maliciously, arbitrarily, capriciously and in excess of the jurisdiction of the Commissioner of Internal Revenue.
It is settled that if a public officer threatens to do an illegal act which would result in damage to an individual the latter may enjoin such threatened conduct by bill in equity. Philadelphia Co. v. Simpson, 223 U. S. 605. This relief plaintiff has obtained by the suit in Florida resulting in the decision by the Supreme Court in 284 U.S. 510.
*39 It is also held that if a. public officer refuses to perform a ministerial act to the injury of a citizen, the latter may recover damages for that injury. Amy v. The Supervisors, 11 Wall. 136.
Plaintiff’s counsel have cited many cases in which a public officer was held responsible in damages for tort committed in the performance of his duty. From them it appears that where a public officer in performing his duties has arrested or imprisoned another or has seized or taken the property of another he is subject to the same liability as a private citizen if hé acted without authority of law. Usually he relied upon an unconstitutional law or acted under a mistake of fact.
Poindexter v. Greenhow, 114 U.S. 270, is an illustration of the seizure of personal property under an unconstitutional statute. Relying upon such a statute the treasurer of the city of Richmond refused to accept in payment of taxes coupons cut from bonds of Virginia and seized plaintiff’s desk for nonpayment of taxes. He was held personally hable in detinue. Willis v. Miller, 29 Fed. 238, is a similar case.
Scott v. Donald, 165 U.S. 58, is another example. Defendants were constables of South Carolina. They seized small amounts of plaintiff’s liquors on the ground that they were in the state in violation of the dispensary act. The Supreme Court held that statute to be unconstitutional and defendant hable in damages for the unlawful seizure.
In Little v. Barreme, 2 Cranch 170, the officer acted under mistake of fact. Little was commander of an American armed ship. Acting under direction of the President given under the non-intercourse law of November 9, 1779, Little captured a Danish brigantine. The vessel was captured while on a voyage jrom a French port and not to a French port. Under those facts it would not have been hable to capture on the high seas, even though it had been an American vessel. Little was held liable in damages.
In Bates v. Clark, 95 U.S. 204, defendants, army officers, seized liquors beheved to be in the Indian Territory. They were mistaken as to the location and were held liable as trespassers.
*40 U. S. v. Lee, 106 U.S. 196, involved retention of real estate under orders of defendant’s superior officers in the United States Army. It was held that the officer could not defend against plaintiff’s title except by showing superior title in the United States.
In Tindal v. Wesley, 167 U.S. 204, 222, the principle applicable to such cases was thus stated:
“When such officers or agents assert that they are in lawful possession, they must make good that assertion when it is made to appear in a suit against them as individuals that the legal title and right of possession is in plaintiff.”
The foregoing cases involved acts of trespass by public officers which resulted in a direct taking or retention of plaintiff’s property for the benefit of the government.
In Hopkins v. Clemson College, 221 U. S. 636, the college built upon its land dykes which threw such a quantity of water upon plaintiff’s land as to amount to a taking thereof within the principle applied in U. S. v. Lynah, 188 U.S. 445. It was held that the state could not confer upon the college authority to commit a tort of this character and escape liability for damages.
In Belknap v. Schild, 161 U. S. 10, it was held that if a public officer while in the course of his duty infringes the patent rights of another he is individually liable to the latter. Here also the public officer is directly taking for the benefit of the government the property of another. Because of its in-corporal character the property can only be taken by an act of infringement.
I believe the foregoing covers each class of cases cited by plaintiff except Robinson v. Chamberlin, 34 N.Y. 391, and similar cases on page 14 of the brief. These are suits for damages due to negligence in the construction or repair of a canal belonging to the state, and follow the principle applied in the case of defective highways. I think that principle is not applicable here.
*41 It affirmatively appears that no property of plaintiff was distrained by the collectors. But even if the collectors had seized plaintiff’s property to pay the assessed taxes apparently no action would lie against them under the decisions of the Supreme Court in Harding v. Woodcock, 137 U.S. 43, Haffin v. Mason, 15 Wall. 671, and Erskine v. Hohnbach, 14 Wall. 613. These cases hold that where an assessment has been made it is the duty of the collector of internal revenue under the statutes to proceed with the collection, that he has no right or option to question the validity of the assessment, and that he is not liable in damages for performing his duty even though the assessment was illegally made.
In Kilbourn v. Thompson, 103 U.S. 168, the sergeant-at-arms of the House of Representatives was held to be not privileged from suit because of his arrest of Kilbourn pursuant to a resolution of the House of Representatives which was beyond its constitutional authority. But the privilege was applied to members of Congress.
It remains to apply these principles to the facts in this case.
The decision of Mr. Blair, then Commissioner of Internal Revenue, in 1929 assessing a tax against plaintiff was one requiring the exercise of judgment of the highest order.
It was the Commissioner’s duty to first construe the law and determine whether it applied to vegetable-oil products, and second to determine on the facts whether plaintiff’s product was taxable under the oleomargarine statute.
The Supreme Court has held that the Commissioner’s construction of the law was erroneous.
Plaintiff’s counsel assert that under this decision of the Supreme Court the Commissioner had no jurisdiction over the plaintiff’s product, and that therefore any and all acts of the Commissioner and all other officials of the Treasury Department in connection with plaintiff’s product were illegal *42 and entirely outside the jurisdiction of the Treasury Department; and that any official who is responsible for the doing of any act in connection with the assessment of such taxes is liable in damages to plaintiff for any injuries caused thereby.
(Appeal Noted Jan. 8, 1934. Ed.)
This is not a correct statement of the principle as applicable to a judge.
It was part of the duty and within the jurisdiction of the Commissioner to determine in the first place the proper construction of the law. The construction he adopted has been held to be correct by Judge Brown in the first Higgins case. His error of judgment was only an excess of jurisdiction and not a clear absence of jurisdiction. This clearly appears from the portion of the opinion in Bradley v. Fisher, supra, which I have underscored (p. 25).
Judge Reeves and the three judges composing the Circuit Court of Appeals followed the erroneous construction of Commissioner Blair and committed the same error. It is not disputed that these judges and the attorneys for the government who led them into error are privileged from suit at the hands of the Harrow-Taylor Company because of that error.
In my opinion the same principle applies to the Commissioner of Internal Revenue who made the assessment against plaintiff and to official acts done by his successors in connection with the assessment.
The principle is applicable also to defendants Mellon and Mills. All of their acts complained of were acts requiring the exercise of judgment and discretion. They are privileged from suit at the hands of plaintiff for damages alleged to have been caused by the actions of several commissioners or by the acts alleged to have been done by said defendants themselves, even if the defendants and the several commissioners, or any one or more of them, acted maliciously, arbitrarily, capriciously and in excess of their jurisdiction.
The demurrers are sustained.